RUSANDA *v*. ÆTNA LIFE INSURANCE COMPANY
OF HARTFORD, CONN.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
   On appeal from directed verdict for defendant, evidence is viewed in most favorable light towards plaintiff.

2. INSURANCE—GROUP POLICY A PART OF CONTRACT WITH INSURED EMPLOYEE.
   Provisions of master policy of group insurance are part of contract of insurance which may be invoked by beneficiary under certificate issued to insured employee.

3. SAME—PERMANENT AND TOTAL DISABILITY—EVIDENCE—NEUROSIS —SUICIDE.
   In action by beneficiary under certificate issued under group life insurance policy containing clause for payments in case insured should become totally and permanently disabled, evidence *held*, sufficient to present question to jury as to whether insured became permanently and totally disabled during employment where his ailment was diagnosed as a neurosis and resulted in suicide within two months after last period during which he tried to work.

Appeal from Wayne; Campbell (Allan), J. Submitted January 19, 1937. (Docket No. 38, Calendar No. 39,269.) Decided June 29, 1937.

Action by Theresa Rusanda against Ætna Life Insurance Company of Hartford, Connecticut, a foreign corporation, for sums due under a group insurance policy. Directed verdict and judgment for defendant. Plaintiff appeals. Reversed and new trial ordered.

*Dann & Atlas,* for plaintiff.

*Butzel, Eaman, Long, Gust & Bills (Charles F. Cummins,* of counsel), for defendant.

Butzel, J. Plaintiff, claiming to be the beneficiary under a group policy issued by defendant and the Chrysler Corporation, brought suit upon such policy. The master policy issued by defendant to the Chrysler Corporation and for which a certificate was issued to decedent, contained provisions similar to those that were discussed in *Turner* v. *Chrysler Corporation,* 277 Mich. 689, wherein we held a jury question was presented when there was testimony showing that the employee had become permanently and totally disabled prior to his discharge by his employer. In *Rothermel* v. *Ætna Life Ins. Co.,* 275 Mich. 425, we cited previous cases and reiterated that the provisions in the master policy are part of the contract of insurance and plaintiff may invoke them. The master policy in the instant case provided:

"If any member while insured under the policy becomes totally disabled before age 60 and if the disability will presumably prevent the member for life from engaging in any occupation or employment for wage or profit and if satisfactory evidence of such disability is furnished the Ætna Life Insurance Company at its home office, the insurance company will pay the amount of insurance in force upon such member's life at the time the disability commenced. Payment will be made in instalments in accordance with settlement option number two or three stated below as shall be designated."

Was there sufficient evidence to raise a jury question as to whether decedent had become totally dis-

abled prior to his discharge by the employer? We must view the testimony in the most favorable light towards plaintiff as the verdict for defendant was directed. It appears that decedent had a severe nervous breakdown after working for his employer for over four years. His foreman sent him to the employer's doctor who found him suffering from nervous exhaustion, irritability and weakness, neurosis with dyspepsia and recommended that he be allowed to go home. The doctor recommended that he stop work and prescribed four different kinds of medicine that included two different sedatives. Both on positive and negative findings, the ailment was diagnosed as neurosis. The doctor, who saw him several times at the end of September, testified that the suicide at the beginning of December was definitely connected with the condition he found in September. In referring to the condition, he stated:

"It was schizophrenic, he was morose, the type of individual at the time I saw him, who was melancholic. It seemed that he thought the world was against him. He was entering—I couldn't say it was a manic depressive condition, but it simulated that, that very often leads to suicide."

A graduate nurse who was sent as an investigator for the mutual aid division of the employer corporation stated that when she went to see decedent, she found him depressed and in a nervous state and told him at the time that work was his salvation. He did go back to work on or about October 1, 1933, and after working 10 days, he was obliged to stop. Decedent's sister testified that during these 10 days, he was sick, but went to work because he was afraid of losing his job; that he could neither eat nor sleep; that it was difficult to get him to go to work and on

one or two occasions he came home before the end of the day. Decedent's mother testified as follows:

"My son was ill during August, and he kept on going to work. He worked a few days, and then he was dismissed. After he was dismissed, he was asked or called back to work, and when he was called back to work, he worked a few days, and during the time that he was called back to work, he worked at least two or three hours and then he came home. That is when he became very ill. And then he came home after being called, and being that he was not able to work, staying only three hours, two hours, a day. * * *

"Q. What was the color of his cheeks and his complexion after September, 1933?

"A. His weight went down very low, and his skin was very sallow and his fingers and skin was very long. After September, 1933, he went down to about 125 pounds. He continued to lose weight after September, 1933. He continued to lose weight during the time that he went back to work, 10 days during October, 1933. I saw him take medicine in September, 1933, and October, 1933. * * *

"Q. How did he happen to go back to work during the 10 days in October, 1933, if you know, if you were present during any conversation?

"A. The nurse told him to go back, if he does not he would lose his job. Yes, he did go back to work. He told me that, 'Mother, I am sick, but I will go.'

"Q. Did he work full days during those 10 days?

"A. No. He did not have very much energy to go back to work during September—before September, it was rather hazy before that, as to whether he wanted to go back, wanted to work or not. During the years before he got sick, I did not have any trouble with him in getting him to go to work. Before September, 1933, he did not cry, but you could tell that he was worried and unhappy. He started to cry in September, around September, 1933.

"*Q.* How often would he have these crying spells after September, 1933?

"*A.* Every time I would suggest a doctor to him, to go to a doctor, why he would start in crying.

"*Q.* Did he ever cry, have crying spells, during the time that he went back to work for the Chrysler, from October 1 to October 10, 1933?

"*A.* No, the only thought in mind that he had was that the nurse told him to go back to work, and he did not want to lose his position."

The medical expert testified that from September 19, 1933, up to the time of his death, decedent was totally and fully disabled. The employer's hospital record dated September 17, 1933, showed that decedent was allowed to go home and that he was suffering from nervous exhaustion. On December 2, 1933, he committed suicide.

We are not unmindful of the testimony introduced by defendant which would counteract the claims of plaintiff and would attribute decedent's despondency to disappointment and failure of achievement. There, however, was a jury question presented on the issue of decedent's permanent and total disability.

The case is reversed, with costs to plaintiff and a new trial ordered.

FEAD, C. J., and NORTH, WIEST, BUSHNELL, SHARPE, POTTER, and CHANDLER, JJ., concurred.